# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### September 5, 2002 Session

**STATE OF TENNESSEE  v.  LINNELL RICHMOND**

**Appeal from the Knox Criminal
Court for Knox County
No. 58152A & 58152B     Hon. Richard R. Baumgartner, Judge**

---

**No. E2000-01545-SC-R11-CD - Filed November 1, 2002**

---

Following a jury trial, the defendant, Linnell Richmond, was found guilty by a Knox County jury of aggravated robbery, attempted aggravated robbery and two counts of attempted first degree premeditated murder.  The trial court sentenced the defendant to an effective sentence of twenty-two years for his convictions, to be served consecutively to a federal sentence arising out of the same criminal episode.  The Court of Criminal Appeals reversed the judgment of the trial court upon finding that the trial court erred in failing to instruct the jury on: (1) the "natural and probable consequence rule" in relation to the charges of attempted first degree murder; and (2) robbery as a lesser-included offense of aggravated robbery, and attempted robbery as a lesser-included offense of attempted aggravated robbery.  The State appealed to this Court, and we granted the application.  We hold that: (1) it was harmless error by the trial court to fail to instruct the jury on the natural and probable consequences rule in relation to the charge of attempted first degree murder; and (2) it was likewise harmless error by the trial court in failing to instruct the jury regarding robbery as a lesser included offense of aggravated robbery, and attempted robbery as a lesser-included offense of attempted aggravated robbery.  Therefore, the judgment of the Court of Criminal Appeals is reversed, and the defendant's convictions are reinstated.  This case is remanded to the trial court for enforcement of the judgment.

**Tenn. R. App. P. 11 Application for Permission to Appeal; Judgment of the  Court of Criminal Appeals Reversed; Case remanded for judgment consistent with this opinion. Costs in this Court are taxed to the State of Tennessee.**

WILLIAM M. BARKER, J., delivered the opinion of the court, the panel of which consisted of FRANK F. DROWOTA, III, C.J., and E. RILEY ANDERSON, A., J., ADOLPHO A. BIRCH, JR., and JANICE M. HOLDER, JJ.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Robert L. Jolley, Jr., Assistant District Attorney;

for the appellant, State of Tennessee.

Wade V. Davies, Knoxville, Tennessee (on appeal) and Keith E. Haas, Sevierville, Tennessee (at trial) for the appellee, Linnell Richmond.

## OPINION

## FACTS

On the evening of February 18, 1995, Mose Cuxart was standing in front of the Magic City Lounge with Charles Stephen Earls, Shannon Brown, and Kevin Brown. Suddenly, four men came around the corner of the club brandishing weapons and demanding that the group hand over their money. Mr. Cuxart had $200 cash in his back pocket, which he gave to the men, but the others had no money. Mr. Cuxart testified that the apparent leader of the assailants held a .9 millimeter handgun to his face and was wearing a "cat mask" during the robbery. Mr. Cuxart further testified that all four men had masks on during the robbery. However, in prior testimony, he claimed that there had only been three assailants on the evening of February 18.

After this initial confrontation, the assailant who had placed a gun to the face of Mr. Cuxart – later identified as Shervon Johnson or "Goldie" – entered the Magic City Lounge in order to rob the patrons and employees. However, before entering the club, he ordered his confederates to "cancel" the victims. Mr. Cuxart testified that in response to this order from defendant Johnson, the tallest of the assailants fired an Uzi sub-machine gun in the general direction of the victims, forcing the group to hide behind the front door of the club. It was later learned that Shannon Brown was grazed by a bullet most likely fired from the Uzi. Mr. Cuxart later identified the shooter as William Fred Underwood.

Charles Stephen Earls, who worked as a bartender at the Magic City Lounge and was outside with Mr. Cuxart at the time of the robbery, generally corroborated the aforementioned events. Mr. Earls stated that four assailants came around the building, and that two of the men were wearing "cat masks," one had a hood over his face, and one did not have on a mask. Mr. Earls identified William Fred Underwood as not wearing a mask. Mr. Earls further stated that one of the men wearing a "cat mask" who had a large "afro" took money from Mr. Cuxart. Mr. Earls also testified that after he told the assailants that he did not have any money, the lead assailant ran into the club with an Uzi. However, Mr. Earls admitted that he had previously stated that William Fred Underwood, not Shervon Johnson, was the assailant who was carrying the Uzi.

As Mr. Johnson entered the Magic City Lounge, he first approached Leonard Maurice Hill, the DJ who was working the night of the robbery. Mr. Hill testified that he was behind the DJ booth when a man with a mask and a silver colored handgun came in and told him to empty his pockets. When the assailant momentarily turned around to face patrons at the bar, Mr. Hill

2

tackled him and forced the handgun from his possession. The two men struggled for a short time and fell out the front door of the Magic City Lounge. Mr. Hill was successful in pinning Johnson to the floor. While on the floor, Johnson yelled to his confederates to shoot Mr. Hill. At this point, Mr. Cuxart grabbed Mr. Hill and pulled him back inside the club, and the assailants ran from the club. Mr. Hill described his assailant as having a large "afro" but admitted that he could not identify the man further. However, the struggle caused the assailant to lose his mask whereupon Mr. Cuxart, Mr. Earls and a female patron at the club identified the man as Shervon Johnson, or "Goldie."

Mr. Cuxart testified that the assailants fled the scene in a maroon two-door Buick with a white top. Believing they had left, Mr. Cuxart and Mr. Earls exited the front of the club to summon the police. However, the assailants drove to the front of the club and parked their vehicle. Mr. Cuxart and Mr. Earls testified that they then saw Mr. Johnson lean out the open passenger-side window and fire the Uzi sub-machinegun at them. Mr. Cuxart stated that none of the bullets came close to him because he fell to the ground and rolled. Mr. Earls was likewise unhurt and testified that the bullets fired from the car hit approximately thirty feet from where he and Mr. Cuxart were standing. Mr. Earls also testified that it was a frequent occurrence for bullets to be fired in the parking lot of the club. Investigators later discovered numerous bullet holes in the exterior wall of the club.

Officer Bruce Conkey of the Knoxville Police Department was parked in a lot down the street from the club when he heard several gunshots in rapid succession. He looked toward the Magic City Lounge, which was approximately a half block away, and saw muzzle flashes coming from the passenger side of a car parked in front of the club. As the car sped away, Officer Conkey gave chase, with Officer Jerred Smith following behind him in another squad car. Officer Conkey followed the car for about a mile at a speed of fifty to sixty miles-per-hour, until the car went the wrong way on a one-way street and "spun-out." The car came to a stop facing Officer Conkey's patrol car. Officer Conkey testified that a black male emerged from the passenger side front seat of the car wearing a toboggan and ran off. Officer Jerred Smith chased after this assailant and apprehended him a few yards from the vehicle. This individual was later identified as William Fred Underwood. Officer Conkey then saw another black male with a "Don King style afro" exit the car, throw down a gun, and run. The weapon was later identified as an Uzi. As a third passenger attempted to exit the vehicle from the driver's side, Officer Conkey reached the Buick and apprehended the man. Officer Conkey later identified the man as defendant Linnell Richmond. Richmond did not have any weapons or money on his person and was not wearing a ski mask or toboggan. After securing defendant Richmond, Officer Conkey went over to where Officer Smith had apprehended Mr. Underwood and placed him in handcuffs.

Officer Brian Davis testified that he followed behind Officers Conkey and Smith in his patrol car and approached the Buick as defendant Richmond was placed under arrest. As Officer Davis approached the stopped vehicle, he noticed a fourth passenger, later identified as Frank

3

Wilburn, attempting to exit the vehicle from the back seat. Officer Davis immediately placed Mr. Wilburn under arrest and assisted the other officers on the scene. A fourth Knoxville Police Officer, James Claiborne, followed the chase on a parallel street. Officer Claiborne stated that after the vehicle stopped, he saw a black man dressed in black clothing jump a fence and enter the neighboring housing projects. Officer Claiborne witnessed the man talk with a resident of the housing projects and enter an apartment. Officer Claiborne went to the apartment, knocked on the door and was allowed in. Once inside, he found Mr. Johnson lying on a couch. Officer Claiborne immediately placed Mr. Johnson under arrest. A protective search revealed that Mr. Johnson had about $235 on his person. Officer Claiborne also stated that he found a .9mm cobra handgun near a telephone pole at the scene of the stop.

Officer Mark Waggoner, a crime lab officer with the Knoxville Police Department, examined and tested the bullets, spent shell casings, and fragments found at the club. He stated that numerous bullets struck the front of the Magic City Lounge at approximately chest level. A gun, cat mask, and loaded magazine were found on the floor inside the lounge, but no fingerprints were recoverable from the gun. Officer Waggoner further identified photos of Shannon Brown's clothing with a bullet hole, a wound on Shannon Brown's side and a picture of Shannon Brown. None of the bullet fragments were tested for gun comparison, and none of the guns were tested to see if they had been recently fired. No tests were conducted for fingerprints on either the .9mm Uzi or the .25 caliber silver pistol.

Based on the above evidence, a Knox County jury found defendants Johnson and Richmond guilty of aggravated robbery, attempted aggravated robbery and two counts of attempted first degree premeditated murder. Defendant Johnson was also convicted of the additional attempted aggravated robbery of Leonard Hill. The trial court then sentenced defendant Richmond to twenty-two years for his convictions. Defendant Johnson was ordered to serve an effective sentence of seventy years for his convictions. The trial court further ordered that both Defendants serve their state sentences consecutively to a federal sentence arising out of the same criminal episode and conduct as the state sentences.[1]

On appeal to the Court of Criminal Appeals, the convictions of defendant Richmond were reversed based on two alleged errors by the trial court. First, citing State v. Howard, the Court of Criminal Appeals concluded that because the State was relying upon the theory of criminal responsibility, error was committed by the trial court when it failed to instruct the jury on the natural and probable consequences rule regarding the attempted first degree murder convictions. The Court of Criminal Appeals further concluded that this error was not harmless beyond a reasonable doubt. Second, the Court of Criminal Appeals determined that it was error not to

---

[1] The Court of Criminal Appeals affirmed the convictions of Shervon Johnson, and he has not appealed to this Court.

charge the jury on the lesser-included offenses of robbery and attempted robbery as they relate to aggravated robbery and attempted aggravated robbery.

**Discussion**

**I. The Natural and Probable Consequences Rule**

The natural and probable consequences rule arose as a common law component of criminal responsibility and extends criminal liability to the crime intended by a defendant, and collateral crimes committed by a co-defendant, that were the natural and probable consequences of the target crime. See State v. Carson, 950 S.W.3d 951 (Tenn. 1997). We have noted on several occasions that "criminal responsibility is not a separate, distinct crime. It is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." State v. LeMacks, 996 S.W.2d 166, 170 (Tenn. 1999). This doctrine became entrenched in American jurisprudence in part due to the realization that there are often times multiple parties to a crime who play distinct roles before, during, and after a criminal offense has been committed. The necessary distinction between parties to a criminal act resulted in systematic classifications according to culpability and participation in the charged offenses. A principal in the first degree was the criminal actor, the one who engaged in the act with the requisite mental state. See State v. Thomas, 619 S.W.2d 513, 514 (Tenn. 1981) (stating that a principal in the first degree is the person who actually commits the crime). In order for an individual to be a principal in the second degree (more commonly known as an aider and abettor), a person must have "advised, counseled, procured, or encouraged the principal to commit the offense and was present at the scene of the crime." Carson, 950 S.W.2d at 954, (quoting Flippen v. State, 365 S.W.2d 895 (1963)).[2]

---

[2] This historical definition quickly expanded, and the physical presence of an aider and abettor is not necessary. In Cavert v. State, 14 S.W.2d 735, 738 (Tenn. 1929), we recognized that:

> if the abettor, at the time of the commission of the crime, were assenting to it, and in a situation where he might render some aid to the perpetrator, ready to give it if necessary, according to an appointment or agreement with him for that purpose, he would, in the judgment of the law, be present and aiding in the commission of the crime. It must therefore be proved that the abettor was in a situation in which he might render his assistance, in some manner, to the commission of the offense. It must be proved that he was in such a situation, by agreement with the perpetrator of the crime, or with his previous knowledge consenting to the crime, and for the purpose of rendering aid and encouragement in the commission of it. It must also be proved that he was actually aiding and abetting the perpetrator at the time of the crime. . . The question to be determined in

In time, these distinctions were abandoned in favor of allowing principals and accessories to be prosecuted equally. For instance, the Tennessee General Assembly enacted a statute providing that "all persons present, aiding and abetting, or ready and consenting to aid and abet, in any criminal offense, shall be deemed principal offenders, and punished as such." Tenn. Code Ann. § 39-109 (1975).

The current criminal responsibility statute in Tennessee is a product of the work done by the Law Revision Commission (Commission) and the general assembly. In a study of the state's criminal statutes and procedures, the Commission proposed a tentative draft of a new criminal code that, among other things, redefined complicity.[3] In 1989, the Tennessee General Assembly adopted the Commission's recommendations and codified the common law doctrine of criminal responsibility. Subsequent revisions of the statute occurred but deviated little from the earlier version or the common law principles. The current form of the statute provides:

> [a] person is criminally responsible for an offense committed by the conduct of another if: (1) Acting with the culpability required for the offense, the person causes or aides an innocent or irresponsible person to engage in conduct prohibited by the definition of the offense; (2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense; or (3) Having a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with intent to benefit in the proceeds or results of the offense, or to promote or assist its commission, the person fails to make a reasonable effort to prevent commission of the offense.

Tenn. Code Ann § 39-11-402(2) (1997). A comment by the drafters of this provision indicates that this "is a restatement of the principles of Tennessee common law that provide equal criminal liability for principals, accessories before the fact, and aiders and abettors." Tennessee Sentencing Commission section 39-11-401 (1997). Specifically, the statute makes a defendant criminally liable for the acts of confederates that are the natural and probable consequence of the crime in which the defendant participated. Extending criminal liability to secondary actors is reasonable as

> ascertaining whether a person is in a position to aid and abet in the commission of an offense, is not so much where he may happen to be, as whether he is in a position to render aid and encouragement to the actual perpetrator.

[3] A person is criminally responsible as a party to an offense if the offense is committed by . . . the conduct of another for which he is criminally responsible, [and that a] person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, directs, aids, or attempts to aid the other person to commit the offense . . . ." Tenn. Crim. Code §§ 501-502 (Tentative Draft 1972).

long as the crimes committed by others were the foreseeable result of the consummation of the intended crime. Thus, the statute may apply despite the fact that the criminal conduct of others differs from or exceeds the scope of the target crime.

This Court examined the scope and breadth of the complicity statute in State v. Carson, 950 S.W.2d 951 (Tenn. 1997).[4] In Carson, we determined that the legislature clearly intended that the natural and probable consequences doctrine survive codification. We recognized that while "the common law rule has been subject to criticism by some commentators,"[5] the rule is "applied by a majority of courts under a variety of statutes governing criminal responsibility."[6] Id. at 955. Thus, the doctrine remains "a viable principle underlying criminal responsibility" in Tennessee. Id.

Our most recent statement touching upon the natural and probable consequences doctrine was in State v. Howard, 30 S.W.3d 271 (Tenn. 2000).[7] We took that opportunity to reiterate that

---

[4] In Carson, three men planned and executed a robbery of a store in Knoxville, Tennessee. Defendant Carson provided his co-defendants with invaluable information regarding the layout of the store, but waited outside while the robbery occurred. His co-defendants successfully robbed the store, then fired shots through an office door where store employees were bound. The State, relying upon the theory of criminal responsibility, charged Carson with aggravated robbery, two counts of aggravated assault, and felony reckless endangerment. The State contended that Carson was guilty of the additional charges because they were the natural and probable consequences of the robbery.

[5] Lafave and Scott argue that the rule "tests the outer limits of the mental state requirement for accomplice liability" by questioning how intent to commit an offense could correctly be imparted to impute intent to another offense which was the consequence of the first. 2 Wayne R. Lafave & Austin W. Scott, Jr., Substantive Criminal Law § 6.8(b), at 158 (1986).

[6] See People v. Prettyman, 926 P.2d 1013 (Cal. 1996) (holding that a defendant may be held criminally responsible for any crime that is the natural and probable consequence of the target crime); see also Chance v. State, 685 A.2d 351 (Del. 1996) (holding that an accomplice for assault could be held responsible for unintended death of victim); People v. Cole, 625 N.E.2d 816 (Ill. App. Ct. 1993) (holding that an acomplice can be liable for any acts in furtherance of a common criminal design or agreement); State v. Bowman, 588 A.2d 728 (Me. 1991) (holding that a reckless or criminally negligent killing by the principal was a reasonably foreseeable consequence of the defendant's own conduct); State v. Fillipi, 335 N.W.2d 739 (Minn. 1983) (holding that culpability rested on whether a defendant knew or reasonably could foresee the consequences of defendant's actions).

[7] In Howard, four armed assailants entered a restaurant after it had closed with the intent to rob the establishment and its employees. During the commission of the robbery, one of Howard's co-defendants shot and killed the store manager. At trial, defendant Howard admitted that he

the purpose of the natural and probable consequences rule is to hold aiders and abettors "responsible for the criminal harms they have naturally, probably and foreseeably put into motion." Id. at 276; see also Key v. State, 563 S.W.2d 184, 186 (Tenn. 1978). More importantly, we put forth the test that courts are to apply when liability is based upon the natural and probable consequences rule. Specifically, we held that the State must prove beyond a reasonable doubt and the jury must find: "(1) the elements of the crime or crimes that accompanied the target crime; (2) the defendant was criminally responsible pursuant to Tennessee Code Annotated section 39-11-402; and, (3) that the other crimes that were committed were the natural and probable consequences of the target crime." Howard, 30 S.W.3d at 276. This rule underlies the doctrine of criminal responsibility and exists to ensure that all culpable parties to criminal acts are held accountable for their participation. Furthermore, it reinforces the principle that the jury, not the court, is vested with the power to weigh the sufficiency of evidence and determine whether collateral crimes, committed by relevant parties in both physical and spatial proximity of the target crime, are the natural and probable consequences of the intended criminal behavior.

### A. Instructions On The Natural And Probable Consequences Rule

We agree with the Court of Criminal Appeals that based on our prior holdings in Carson and Howard, the natural and probable consequences rule should have been charged to the jury. Clearly, Howard stands for the proposition that the natural and probable consequences rule is "an essential element that the State must prove beyond a reasonable doubt" when seeking a conviction based on theory of criminal responsibility. Howard, 30 S.W.3d at 277 (Tenn. 2000). The State may satisfy this burden only by strict compliance with the three-pronged test as established by Howard. In this case, the third prong requires the State to prove that attempted first degree murder was a natural and probable consequence of the aggravated robbery. Proper instructions to the jury should have included reference to this rule. Therefore, it was error by the trial court not to instruct the jury on the natural and probable consequences rule in relation to the charges of attempted first degree murder of Mose Cuxart and Shannon Brown.

### B. Harmless Error Analysis

Having concluded it was error not to charge the jury on the natural and probable consequences rule, it remains to be determined whether this error was harmless. In that respect,

accompanied his confederates to the restaurant knowing that they intended to rob it, but he asserted that he remained in the back of the restaurant and did not directly aid in the criminal acts. Mr. Howard was ultimately charged with first degree premeditated murder, two counts of first degree felony murder, especially aggravated robbery, and conspiracy to commit aggravated robbery. The State argued that under Tennessee Code Annotated section 39-11-402(2), Mr. Howard was criminally responsible for the crimes committed by his confederates, and the jury convicted Mr. Howard on all charges. On appeal, Mr. Howard argued that because the trial court did not instruct the jury on the natural and probable consequences rule, the conviction could not stand.

8

the Court of Criminal Appeals made no apparent distinctions between the facts of <u>Howard</u> and the present case and determined that because the jury was not permitted to consider whether the attempted first degree murders were the natural and probable consequences of the armed robbery, the trial court committed reversible error. We respectfully disagree.

We have previously held that a trial court's failure to charge the natural and probable consequences rule when warranted by the evidence is constitutional error. <u>See</u> <u>Howard</u>, 30 S.W.3d at 277 n.6.[8] For such error to be harmless, the State has the burden of establishing beyond a reasonable doubt that the error did not affect the outcome of the trial. <u>See id</u>. (citing <u>Neder v. U.S.</u>, 527 U.S. 1 (1999)). We reiterate that it is the jury's role as fact-finder to decide whether the State has proven all essential elements of an offense beyond a reasonable doubt. <u>See</u> <u>Howard</u>, 30 S.W.3d at 277. Yet, the United States Supreme Court made clear in <u>Neder</u> that when a jury's verdict "necessarily included a finding" on the omitted element, the error may be harmless. 27 U.S. 1, 26 (1999) (Stevens, J., concurring). <u>Neder</u> further clarified that this type of harmless error is not limited to situations wherein the jury's verdict necessarily included a finding on the omitted element. Thus, it is proper for a reviewing court to make a thorough examination of the record to determine if, beyond a reasonable doubt, the jury verdict would have been the same absent the error. <u>See</u> <u>Allen</u>, 69 S.W.3d at 190. A reviewing court must ask whether the record contains evidence that could rationally lead to a contrary finding by the jury with respect to the omitted element. <u>See id</u>. If, after viewing the evidence in the light most favorable to the State, there is no rational basis for a contrary conclusion by the trier of fact, then the omitted element constitutes harmless error.

We hold that, as to the defendant in this case, the trial court committed harmless error by failing to instruct the jury on the natural and probable consequences rule. The facts of the defendant Richmond's case are similar to the facts in <u>Howard</u>, yet we recognize important differences that distinguish <u>Howard</u> from the present case. Similar to <u>Howard</u>, defendant Richmond accompanied his confederates to the Magic City Lounge to rob both employees and patrons. In both cases, individuals were shot during the commission of the robbery. Neither defendant Richmond nor Mr. Howard were identified as the shooter, but both were prosecuted under the theory of criminal responsibility. Perhaps most importantly, the target crime in the present case, as well as in <u>Howard</u>, was aggravated robbery. The shootings that occurred in both cases may be classified as collateral (or non-target) to the robbery.

Yet, unlike <u>Howard</u>, where the evidence of the defendant's intent was sharply contested, the evidence here unquestionably established that defendant Richmond shared the intent of his fellow assailants and actively participated in every facet of the armed robbery and subsequent shootings. The assailants, including the defendant, approached the victims with at least three weapons, one being a fully automatic Uzi sub-machine gun. Shervon Johnson twice ordered his fellow robbers to kill the victims, and finally attempted to do so himself. Defendant Richmond

---

[8] In <u>Howard</u>, we could not conclude "beyond a reasonable doubt" that the jury verdict would have been the same absent the omitted instructions. As such, we could not find the error harmless.

9

stood, at most, a few feet from Mr. Johnson when he ordered his confederates to shoot the victims. He furthermore positioned himself so as to offer immediate assistance should the need arise. Testimony established that defendant Richmond drove the getaway car in such a manner as to allow his co-assailant, Shervon Johnson, to fire indiscriminately in the direction of the club. Defendant Richmond then led police officers on a dangerous high speed chase through Knoxville housing projects. The defendant's role was such that the trial court properly charged, and the jury found him criminally responsible for the actions of his confederates. As such, we are convinced, and the jury so concluded, that defendant Richmond shared the same criminal intent as his confederates and clearly aided them in the completion of the target and collateral crimes. We therefore conclude that the attempted first degree murders of Mr. Cuxart and Mr. Brown were undoubtedly natural and probable consequences of the aggravated robbery. We therefore hold that the trial court's failure to instruct the jury on the natural and probable consequences rule did not, beyond a reasonable doubt, affect the outcome of the trial.

### 1. Lesser-Included Offenses Instruction

The defendant argues that the trial court committed reversible error by not charging the jury on simple robbery and attempted robbery as lesser-included offenses of the aggravated form of the offenses. Mr. Richmond argues that the error was not harmless beyond a reasonable doubt because the evidence was contested as to his involvement. The State concedes that the trial court erred, but contends that this error was harmless beyond a reasonable doubt in that it did not affect the judgment of the jury to the prejudice of the defendant.

In a two-to-one decision by the intermediate court, defendant Richmond's convictions for aggravated robbery and attempted aggravated robbery were reversed. The majority concluded that it was error not to charge the lesser-included offenses and that this error was not constitutionally harmless beyond a reasonable doubt. Citing State v. Bowles, 52 S.W.3d 69 (Tenn. 2001), the majority of the Court of Criminal Appeals found that because the State had proven aggravated robbery and attempted aggravated robbery, the lesser-included offenses of robbery and attempted robbery were necessarily proven. Accordingly, the majority turned to part (a) of the test established in State v. Burns, 6 S.W.3d 453 (Tenn. 1999), for the proposition that proof sufficient to merit an instruction on the greater offense required an instruction on any and all lesser-included offenses. Thus, the majority determined that failure to instruct on the lesser-included offenses was error. The majority agreed that this error was not harmless, but no consensus was reached as to the proper analysis supporting this conclusion. As part of the majority, Judge Smith, relying on Williams v. State, 997 S.W.2d 101 (Tenn. 1998), reasoned that because the jury did not reject an intermediate offense the error could not be deemed harmless. In contrast, Judge Wade determined that constitutional harmless error analysis should apply because there was no direct testimony establishing that defendant Richmond was armed or wore a mask on the evening in question. As such, Judge Wade concluded that there existed a reasonable possibility that the failure to instruct on the lesser-included offenses of robbery and attempted robbery substantially contributed to the aggravated robbery and attempted aggravated robbery convictions. The author of the lead opinion for the Court of Criminal Appeals, Judge Woodall, disagreed with the majority's conclusion and

10

argued that the trial court did not commit error in failing to charge the lesser-included offenses. Judge Woodall concluded that because there existed undisputed direct evidence that at least one deadly weapon was used in the commission of the robbery, no reasonable mind could accept the lesser-included offenses of simple robbery and attempted robbery.

### A. Failure To Instruct On The Lesser-Included Offenses of Robbery And Attempted Robbery

In an attempt to make the application of the lesser-included offense doctrine more understandable, we wish to underscore our analysis and holdings in <u>State v. Ely</u>, 48 S.W.3d 710 (Tenn. 2001), <u>Allen</u>, 69 S.W.3d 181 (Tenn. 2002), <u>Burns</u>, 6 S.W.3d 453, and <u>Bowles</u>, 52 S.W.3d 69 (Tenn. 2001), and provide further insight on when lesser-included offense instructions are merited.

We stated in <u>Allen</u> that in applying the lesser-included offense doctrine, three questions must be addressed: "(1) whether an offense is a lesser-included offense; (2) whether the evidence supports a lesser-included offense instruction; and (3) whether an instructional error is harmless." 69 S.W.3d at 187. Accordingly, in this case, we must first determine whether robbery is a lesser-included offense of the charged offense of aggravated robbery, and whether attempted robbery is a lesser-included offense of attempted aggravated robbery. In <u>Burns</u>, 6 S.W.3d 453, we adopted the following test for determining whether a particular offense may properly be categorized as a lesser-included offense of the greater. An offense <u>is</u> a lesser-included offense if:

> (a) all of its statutory elements are included within the statutory elements of the offense charged; or (b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing (1) a different mental state indicating a lesser kind of culpability; and/or (2) a less serious harm or risk of harm to the same person, property or public interest; or (c) it consists of (1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offenses in part (a) or (b); or (2) an attempt to commit the offense charged or of an offense that otherwise meets the definition of lesser-included offenses in part (a) or (b); or (3) solicitation to commit the offense charged or of an offense that otherwise meets the definition of lesser-included offenses in part (a) or (b).

<u>Id</u>. at 466-67. Robbery is clearly a lesser-included offense of aggravated robbery under part (a) of the <u>Burns</u> test because all of its statutory elements are included within the statutory elements of the charged offense. The same is true of attempted robbery and attempted aggravated robbery.

We are next required to determine whether an instruction on the lesser-included offenses is warranted under the evidence. This is accomplished in two steps. First, the court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. Second, the trial court must determine if the evidence, when viewed liberally in the light most

favorable to the existence of a lesser-included offense, is legally sufficient to support a conviction for the lesser-included offense. See Burns, 6 S.W.3d at 469. We stated in Bowles, and reiterated in Allen, that regardless of "the theory of the State or of the defense," the trial court must provide instruction to the jury on all lesser-included offenses if warranted by the evidence." Allen, 69 S.W.3d at 188 (emphasis added). "[A] defendant need not demonstrate a basis for acquittal on the greater offense to be entitled to an instruction on the lesser offense;" it is the evidence that "controls whether an instruction is required." Id. Thus, the general rule may be stated as:

> [e]vidence sufficient to warrant an instruction on the greater offense also will support an instruction on a lesser offense under part (a) of the Burns test. In proving the greater offense the State necessarily has proven the lesser offense because all of the statutory elements of the lesser offense are included in the greater.

69 S.W.3d at 188 (citing State v. Bowles, 52 S.W.3d 69, 80 (Tenn. 2000)). We cannot overemphasize that "the jury, not the judge, performs the function of fact-finder." Burns, 6 S.W.3d at 472. Because our constitution invests the jury with the power to determine both the "law and the facts," the jury is free to reject any evidence offered by the State, no matter how uncontroverted or uncontested a particular fact or element may appear. See Tenn. Const. art. I, § 19. Accordingly, our review of the record in this case leads us to conclude that there was sufficient evidence from which reasonable jurors could have convicted the defendant of the lesser-included offenses of robbery and attempted robbery. Simply stated, defendant Richmond could not have been convicted of aggravated robbery and attempted aggravated robbery without the occurrence or perpetration of the underlying crimes of robbery and attempted robbery. The jury as fact-finder may exercise its power and ignore the State's evidence establishing the use of a deadly weapon (the only element distinguishing the greater offenses from the lesser-included offenses), but without the instruction being given prior to deliberation, the jury is stripped of its constitutionally mandated power to function as fact-finder. Accordingly, it was error for the trial court to fail to instruct the jury on the lesser-included offenses of simple robbery and attempted robbery.

### B. Harmless Error Analysis

Having concluded that the trial court erred by not instructing on the lesser-included offenses of simple robbery and attempted robbery, we must determine whether that error was harmless. In State v. Williams, 977 S.W.2d 101, 105 (Tenn. 1998), we held that the erroneous failure to instruct on lesser-included offenses may be harmless under certain circumstances. More recently, in State v. Ely, 48 S.W.3d 710 (Tenn. 2001), this Court re-examined the standard to be applied when assessing whether a trial court's failure to give lesser-included offense instructions constituted harmless error. After an exhaustive review, we concluded that the defendant's right to the lesser-included offense instruction is statutorily mandated and protected under Article I, section 6 of the Tennessee Constitution. As such, a failure to instruct the jury on lesser-included offenses will merit reversal unless the State proves beyond a reasonable doubt that the outcome of the trial was not affected. In Allen, we reemphasized the principle that the failure to instruct on a lesser-included offense is harmless beyond a reasonable doubt when the "omitted element is

12

uncontested and supported by overwhelming and uncontroverted evidence." <u>Allen</u>, 69 S.W.3d at 189; <u>see</u> <u>also</u> <u>Neder v. United States</u>, 527 U.S. 1 (1999), <u>State v. Ducker</u>, 27 S.W.3d 889, 899-900 (Tenn. 2000), <u>State v. Garrison</u>, 40 S.W.3d 426, 435 (Tenn. 2000). Perhaps of most relevance, we held in <u>Allen</u> that:

> where an omitted element is supported by uncontroverted evidence, this approach reaches an appropriate balance between 'society's interest in punishing the guilty [and] the method by which decisions of guilt are made.' . . . In a case such as this one, where a defendant did not, and apparently could not, bring forth facts contesting the omitted element, answering the question whether [the] jury verdict would have been the same absent the error does not fundamentally undermine the purposes of the jury trial guarantee.

69 S.W.3d at 190-91.

In accord with the aforementioned principles, we have conducted a thorough review of the record and conclude that the trial court's failure to issue instructions on the lesser-included offenses of simple robbery and attempted robbery constituted harmless error. Defendant Richmond was present at all phases of the robbery and attempted murders. His actions in assisting his confederates (namely Shervon Johnson) established his criminal responsibility for the offenses committed. The State clearly relied upon the use of a deadly weapon to prove the aggravated form of those offenses, and the defendant in no way contested that evidence. In fact, at one point during the trial, defense counsel proposed to the jury that it was possible that the assailants were merely attempting to scare their victims by firing their weapons. We have already mentioned that the trial court is required to instruct on all lesser-included offenses without a specific request by the defendant. However, evidentiary admissions by the defense that distinguish a lesser-included offense from the greater cannot be ignored and must be considered along with the uncontested evidence when conducting harmless error analysis. A contrary conclusion is both illogical and unfounded. Based upon the record in this case, the jury would not have reasonably concluded that the assailants were unarmed. Additionally, the victims who testified at trial collectively indicated that the robbers brandished firearms during the robbery and sprayed the Magic City Lounge with automatic machine-gun fire while fleeing. Photographic evidence introduced at trial established that Shannon Brown and Kevin Brown, who were both present with Mose Cuxart when the robbers appeared, were grazed by bullets fired by one of the assailants. Consistent with testimony from the victims, police officers and investigators recovered more than one firearm including an Uzi machine gun, spent shell casings, a loaded magazine, and bullet fragments in various locations. Investigators also found numerous bullet holes in the exterior wall of the club. In sum, the proof is absolutely overwhelming that deadly weapons were used by the assailants in the commission of these offenses.

The defendant correctly argues that because the proof of aggravated robbery in this case proved robbery, evidence existed that reasonable minds could accept the lesser-included offense of facilitation. As was determined in <u>Allen</u>, the general rule for lesser-included offenses under part (a) of the <u>Burns</u> test does not extend to lesser offenses under part (c) of the test. Establishing

proof sufficient to convict under the greater offense will not necessarily prove the lesser offenses, including facilitation, enumerated in part (c) of the test.[9] The defendant further relies upon <u>Allen</u> and <u>Fleming</u>, 19 S.W.3d 195 (Tenn. 2000), for the proposition that the error was not harmless because his involvement in the robbery and attempted robbery was contested at trial. In <u>Allen</u>, we determined that because the jury was not charged with facilitation as a lesser-included offense, this error was not harmless beyond a reasonable doubt. We also held that the decision to convict on a lesser-included offense cannot be taken away from the jury despite uncontroverted proof supporting the element distinguishing the greater offense from the lesser offense. However, defendant Richmond received the benefit of an instruction on facilitation, but the jury rejected it. As such, defendant Richmond's reliance upon <u>Allen</u> and <u>Fleming</u> for the proposition that the error was not harmless is misplaced.

In sum, when a reviewing court determines whether a lesser-included offense ought to be charged, the evidence clearly controls. If there is evidence sufficient to support a conviction for a lesser-included offense, we hold that a trial court must charge that offense. The determinative test being whether there is evidence sufficient such that a jury <u>could</u> convict on that lesser-included offense. If a jury could convict, no matter how improbable, it is error not to charge that lesser-included offense. However, in deciding whether it was harmless beyond a reasonable doubt not to charge a lesser-included offense, the reviewing court must determine whether a reasonable jury <u>would</u> have convicted the defendant of the lesser-included offense instead of the charged offense. In other words, the reviewing court must determine whether it appears beyond a reasonable doubt that the trial court's failure to instruct on the lesser-included offense did not affect the outcome of the trial. <u>Allen</u>, 69 S.W.3d at 191.

Here, unlike <u>Allen</u>, overwhelming evidence established defendant Richmond's participation in the robbery of Mose Cuxart and attempted robbery of Charles Stephen Earls. Likewise, evidence was overwhelming and uncontroverted that deadly weapons were involved. In proving the greater offenses the State necessarily proved the lesser-included offenses. Therefore, a jury <u>could</u> have convicted the defendant of the lesser-included offense of robbery and attempted robbery. As such, it was error for the trial court not to charge the lesser-included offenses of robbery and attempted robbery. However, our determination whether this error was harmless beyond a reasonable doubt hinges upon what a reasonable jury <u>would</u> have done in light of the evidence produced at trial. We hold that no reasonable jury would have convicted the defendant on the lesser-included offenses of robbery and attempted robbery instead of the charged offenses due to the uncontroverted and overwhelming evidence establishing the use of deadly weapons and his direct participation in the offenses. Any error was harmless beyond a reasonable doubt.

**Conclusion**

---

[9] Our code recognizes that facilitation is established by proof that "knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under section 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403 (2001).

We conclude that while it was error not to charge the natural and probable consequences rule, the error was harmless beyond a reasonable doubt. The jury was instructed on criminal responsibility and there was substantial, and indeed overwhelming, evidence of the defendant's intent to actively participate in the target crime of robbery and in the collateral crimes of attempted first degree murder. We also hold that the error of the trial court in not charging the lesser-included offenses of robbery and attempted robbery was harmless beyond a reasonable doubt. Accordingly, the judgment of the Court of Criminal Appeals is reversed, and the judgment of the of the trial court is reinstated. Costs of this appeal are taxed to the State of Tennessee.

_____

WILLIAM M. BARKER, JUSTICE